v. New York City Department of Education et al. 22-2962. Again, we'll let you get situated at the council table and feel free to raise or lower the podium and adjust the microphones as necessary. Just let's just pause for one moment while we get settled too. May it please the court. Good morning, my name is Rory Bellantoni and I'm here on behalf of the appellants today. The IDEA is a collaborative statute and process, not adversarial. In this case, the district court upheld a decision by the SRO and the IHO, which in essence was punitive. In this case, my clients missed a single meeting, one administrative meeting in 2018. The CSE convened to develop my client's IEP on March 20th of 2018 and my client was at that meeting. Two weeks earlier, she had prevailed in a 2017-18 proceeding and an IHO issued an FOFD finding that the New York City Department of Education denied my client a fate, that the IEP that was proposed, created, was not adequate. At that March 20th, 2018 CSE meeting, the same IEP was proposed that was rejected two weeks earlier. After that meeting, my client sent a letter asking that the CSE reconvene. There was a mix up, dates were changed. There was a meeting, it was scheduled for May 10th, 11th. I submitted, it's not really relevant because that single meeting or that single missed meeting was the basis of the denial here of my client's request for release. In this proceeding, my client prevailed on what you would call the first prong of the Burlington Carter test and actually prevailed by default. The DOE came into the hearing and conceded that they didn't provide this child with a free appropriate public education as they were supposed to. My client then proved or showed that the private school that she was in, or the student was in, was appropriate. After that, the parties turned to the equity. The equitable considerations are not a prong where one party or another sets out to prove there should or shouldn't be reimbursement. What this third prong, if you will, should be, is the IHO looking back, or the administrative officer, at the proceedings as a whole, looking at the conduct by the parties. That's the equitable considerations, that's what it means. That's what it means. It's, I'm talking about how you get there, right? So- But you just referred to equitable- The equitable, yes. Which is the third, right? Prong three. Yeah, and I'm asking whether you're now describing what the equitable considerations are, because equitable considerations is a rather broad term. Yes, yes, and that is a problem. The way that an IHO resident should assess the third prong has really not been established with any kind of particularity. Here, my clients missed the meeting because the DOE didn't come in and demonstrate what they did or didn't do. So the impartial hearing officer could tell them whether what they did or didn't do was appropriate. They simply conceded the first prong, waiting for the parent to show that the private school was appropriate. And then said the parents shouldn't receive the relief they're requesting, which in the due process complaint was reimbursement. And reimbursement for this private school with transportation is over $350,000. The DOE conceded in this proceeding that it did everything it could to establish my client's IEP. My client did not obstruct in any way the DOE's ability to create the student's IEP. In many cases where there's a partial or total reduction, and in this case if there was going to be any reduction, it certainly shouldn't have been total. That was not equitable, given what happened here. The student, as I was saying, in cases where there is a reduction, the parent's obstruction or obstructionist behavior or interference prevents the DOE from recommending an IEP, that wasn't the case here. Just because we have limited time here, could you identify, in your view, were the bases that the agency relied upon for denying the equitable relief? And why you think those bases were wrong? So point out what you think they relied on and why it's wrong. The basis was- The articulated basis, and then tell us why you think that was wrong. It was not appearing at the CSE meeting in May. And I think it's wrong because nothing in the IDEA obligates a parent to be at the meeting. The IDEA was created to strip the school districts of their unilateral authority to change the student's placement. And to give the parents the opportunity to participate in the process, not the obligation. If this decision is upheld, I submit it would fundamentally change the nature of the IDEA. Here in the second circuit at least, if not elsewhere. It now puts a burden upon a parent. There was recently a case in the Eastern District, Judge Chen, 21 CV 3265 from September 25th. The decision is at 41 on the docket. She reversed a similar case. Well, let's just focus, because again, we have very limited time, without talking about other cases. What else do you think the agency relied upon here? Are you saying it was only the missing the meeting? I thought they took the view that there was a broader failure to cooperate. And again, I'm not asking you to agree with it. I'm asking you to spell forth for us. There are four things they relied on. One, two, three, four. Tell me the four points and why each one was wrong. Part of what the court relied on, and I think the DOE articulates as well, is a history of obstruction on the part of the student's attorney and the founder of both IHOPE and IBRANE, a history. However, your honor, when Judge, the district court discusses that history, what was history for the district court would have been the future in May of 2018. In 2018, that history that comes in from other cases, these mass exodus from IHOPE to IBRANE, that was in its infancy then. Ventura, De Palio came out in 2020, many of the cases that Judge Capone talks about. He's asking one, two, three, four. They all came after May of 2018, so there was no history of obstructionist behavior, either on the part of my client, her attorney, or anybody else in 2018. As I said, what the judge refers to as history hadn't happened yet. Because the FOFD for the 2018 school year was drafted or came out and issued in 2020, so that was two years later. So even the IHO and then the SRO, where they articulate this obstructionist behavior, requesting a physician solely for the purpose of obstructing the proceedings, and how that happened in all these other cases, that hadn't happened yet, to the degree that the district court was talking about it, until 2019, 2020, 2021, even though it's irrelevant, it didn't exist at the time. So at the time, there may have been a couple of cases where a physician was requested. My client missed a meeting, and that was the basis here of denying her and the child the relief that they were requesting. A single missed meeting? One missed meeting. In May of, yes, she attended the first CSE meeting in March, on March 20th, missed the next meeting, properly served her 10 day notice, the due process complaint, and moved on from there. She actually, Your Honor, as I said before, after the March 20th meeting that she attended, she requested that the CSE reconvene, and on the reconvene date, she wasn't available. But they went ahead anyway with the meeting. They- And I guess your argument is that even if there is evidence elsewhere in the record that there was an organized campaign to get parents not to attend these meetings, that would be an unwarranted inference here, where you have the March 18th meeting, I think it's the 18th, right? March 20th, 2018. March 20th, 2018, that there was the March 20th meeting that they did attend, and then when they asked for a follow up, the CSE proposed a single date. All the parents did is said that date doesn't work for us. They did send a letter saying it didn't work, and they didn't go to that meeting. They went for it anyway. So there's no, you're saying, I think, that there's certainly no inference in this record that would be warranted to suggest that these parents were not going to attend a meeting because the one in March, they didn't show up for it. Correct, your honor, and two weeks before, IHO Tinklestein found that the parents had been cooperative, anything but cooperative, did everything they were supposed to do, as they did in this case. Taking the child to meetings, giving the DOE authorizations they needed to get medical records. This concerted campaign as discussed by the district court. It wasn't the Neskis carrying that out. To punish this child, and I say punitive, punish this child. Where the DOE admittedly didn't even create an IEP in the first instance because the child's attorney or the founder of the child's school was interfering with other proceedings. I'm not quite sure how that's equitable. We, you've reserved a couple minutes for rebuttal. Why don't we hear from counsel for the advocate? Thank you, your honor. Good afternoon, your honor. May it please the court. Rebecca Vasquez for DOE. The district court properly exercised its broad discretion in denying tuition reimbursement here under prong three of Burlington-Carter. To address your honor's question about what was actually relied upon here, the district court appropriately deferred to the factual and credibility determinations made by the impartial hearing officer and then affirmed by the state review officer. Who both looked at the fact that the Neskis had requested to reschedule the first meeting that DOE had scheduled in April. Communicating through the child's school at the time and through Mr. Donahue, who- Did they propose a date? They, I believe they proposed the March 20th date then. And they attended it. I mean, that's undisputed, right? You didn't dispute it. That is not undisputed. DOE does dispute that. Because I thought in the rule 56 statement, it was said not disputed. So I actually would like to ask you to clarify that. In the rule 56 statement, DOE did dispute that. The confusion here came from the administrative appeal before the state review officer. In which DOE, in reciting the facts, recited what Ms. Nesky had testified to. Which included the fact that there was a March 20th meeting that they attended. And I'm not exactly sure why it was written that way, whether that was an error or what. Could we just look at that, could we look at that, because I want to see where we are. I'm sorry, I don't have this tabbed here. I thought that there was a rule 56 statement by the plaintiffs. And then there was a response, so I don't know, are we on 71 or 70? The SRO seems to have made a determination. The SRO. Likely took place. The SRO said that based on the party's papers before it. That it appeared undisputed at that point. And so found that the meeting took place. But did, in his decision, point out the lack of documentation. That any meeting had occurred on that date. The lack of an IEP produced from the meeting. The lack of an attendance sheet. The lack of meeting minutes. The lack of a prior written notice. The lack of an event log. And the fact that Ms. Chemerinsky, the CSE chairperson who testified at the hearing. Testified that no meeting had occurred on that day. So hang on a second, I'm looking at page A76. And this, I think, is pretty important on this point. And I would welcome your views on this. I'm looking at paragraph 18. And this was a list, I guess, Of the plaintiff's purportedly undisputed. Or statements of undisputed facts. And it reads as follows. The CSE convened on March 20th, 2018. To discuss and develop AN's IEP for the 2018 to 2019 extended school year. At this meeting, AN's mother, Plaintiff Dorothy Nesky. Expressed her disagreement with the CSE's recommendations. For 30 minute long related service sessions. No final IEP was developed as a result of this meeting. Response, undisputed. Paragraph 18 is not framed as saying that the mother testified this way. And that the defendants don't dispute that she testified this way. This is a question of undisputed fact. So when I read this, I don't see any wiggle room for dispute at this point. Now that we're in the district court and we're in summary judgment. For whether or not the meeting happened on March 20th. And whether or not AN's mother attended. Tell me how I'm misreading that paragraph. I believe that in defendant's 56.1 statement at paragraph 9. Which I actually don't have the page directly in front of me. Paragraph 11. Of defendant's rule 56 statement. Which was docket number 46 in the district court. As the district court explained in its decision. The defendants made clear that the March 20th meeting did not occur. In any event. So hang on a second. I'm looking at what I think is. And I'm sorry to. I'm looking at plaintiff's rule 56 statement that starts at A19. This was the defendant's 56.1 statement at docket 46 in the district court. Which I apologize I don't have. The first thing I was just reading. Was the defendant's response to the plaintiff's local rule. 56.1 statement. That's what I was looking at on A76. It does appear that quote from a 22, which was the plaintiffs. It appears that in defendants own rule 56 statement. We framed this differently. I think that this was an issue of perhaps sloppy drafting. Relying on the papers that were put before the SRO. But as the district court pointed out in its decision at A129. At footnote three. Defendants in the district court proceedings. As the district court understood it. Disputed that this meeting occurred. However, the district court did not find this to be a material fact. Because ultimately, whether or not the parents attended a meeting at that point. It's undisputed that no IEP was created at that point. That then it's. Why is it not relevant? Because if it happened. And the parents attended and voiced their views. And then the only thing that ever happened subsequently is. They said, well, we wanted a second meeting. And the, whatever the school board, whatever the CSE is, says, okay. We'll do it on May 11th. And parents said, well, we can't make that date. And then they plow forward otherwise. Seems like the parents failure to attend the second meeting. It'd be very hard to ascribe that to uncooperative behavior. If in fact, the very next, just a couple months previously. They had had a meeting. They'd shown up. They were the ones who asked for a second meeting. And they just said, we have a scheduling issue with the second one. How would you read uncooperativeness into failure to attend at that point? Based on the factual and credibility determination made at each level here. Made it by the IHO, affirmed by the SRO, and then supported by the district court. That the parents had been participating at the time. Not in the future, but in the present when this was happening. In this mass exodus, that this court has recognized was an unusual situation. Spearheaded by Mr. Donahue, the founder of I-Brain. And the founder of the law firm that represents the parents. And has represented dozens of other parents in proceedings before this court. That they all were following the same pattern of rescheduling meetings without explanation of why they needed to be rescheduled. Without any actual indication that there was a conflict. Then making a list of demands, including the physical presence of a DOE physician. Along with presence of many other people who would not normally attend these meetings. Things like a written agenda prior to the meeting date that would not be necessarily part of the normal course. Then- Let me just back up for a second, because I think there are a few things to tease apart. One was you said they had made adverse credibility findings. Yeah. And I recall there was the one adverse credibility finding with respect to the mother. Which was based on inconsistent testimony she gave about whether a law firm had looked at the contract or not. So I understand that if the agency determines this is not a credible witness. To then discredit other things that person says. What specifically then were the things she supposedly said. That then were discredited. I just, I couldn't see that. I just thought it was sort of now an atmospheric thing. Like, well, I didn't credit this one thing she said, and therefore I don't believe that one thing. But did that then have a contagion effect? Were there other things on which her position depends that were rejected by the agency as her being untruthful? Yes, I think so. I think that was the clearest example of clear and consistent testimony. But she also, the fact finder here, recognized that she seemed to be trying to hide the extent of the family's association with Mr. Donahue, saying that they hadn't even learned about I-Brain's existence until after- But to one end, for purposes of the equitable consideration, what were then the other putative lies that she told that were then discredited? Not necessarily lies, just things of not being forthcoming. That she couldn't give any reason why they might have even been unable to attend a May 11th meeting, when they had previously sent a letter saying that they were available on any date to reconvene the CSE. And the fact that she couldn't give any explanation why they had made this demand for the physical presence of a school physician, just in general, the IHO, who had the benefit of actually seeing and hearing her testimony, gave this summary and cited these issues as reasons why her testimony was not credible. And along with the- It's not credible about that, it's more of an inference of nefarious motive. Whereas the notion that she did recall, and that it really was that she, had she told the truth, she would have said, I asked to reschedule the meeting because I was trying to obstruct the process. I wanted a physician there because I wanted, I knew they wouldn't be able to bring the physician, and therefore I knew that this was a fig leaf for making things drag on a long time. I think that, I mean, our position is that if she had been telling the truth, she would have said, I'm being advised by the founder of iBrain to do this in order to create groundwork to challenge this process later on. And that is borne out by the fact that families have used exactly these issues, the lack of presence of the school physician in person, to attempt to challenge IEPs. And district courts, and this court affirming a district court decision in the Carrillo case, have recognized that these were tactics that were being used on a wide level by the parents, the dozens of parents who were all being advised by the same person. When you say a wide level, can you give it a number? I believe there, I think it was in the 20s, a few dozen, a couple dozen parents overall. I know that these cases are still- With findings that the parents were not cooperating. No, that is the number of cases that were challenging the IEPs specifically for the 2018-2019. Right. These cases are still making their way through the courts in some of them so far. I know there have been three cases that have been determined at the district court level solely on equitable considerations, and two of those reduced tuition and one denied tuition entirely. Another case, the Carrillo case I mentioned, didn't get to the equitable prong because the district court found, and this court affirmed, I believe that DOE did provide a free and appropriate public education. However, the district court in its decision recognized these advised by Mr. Donahue had done the same thing as parents in many other cases and were- Parents in many other cases, how many cases are we talking about here? I think the answer is something about 24. You said about 24, but you said, then I asked you in those 24 cases, there were findings that the parents didn't cooperate and you said no. I apologize. By cases, I meant instances in which parents were making the same requests before DOE. I am not representing that those have all- Parents can make requests. Of course. The question is how many cases are there in which there are findings that parents willfully did not lodging their children at high grade? So far to my knowledge, five at the district court level, including this case. And how much of this was, it's not clear to me how much of that is in our record. Is it just the observation of, is it the IHO, if that's the right acronym, individual hearing officers in it? There was also testimony and documentary evidence presented at the hearing about what was happening and about the communications that both, I believe that IHOPE and that the CSE directly were receiving from Mr. Donohue and the fact that these were identical communications in all of the few dozen families who were withdrawing from IHOPE and enrolling in I-BRAIN at the time. Just remind us, so we have this handy. Can you give us some record citations for this? Yes, let me find. So these are all in the administrative record and this was at the administrative record, page 592. It was Chemerinsky's testimony about the number of parents requesting to reschedule their initial meetings. Her testimony continues at administrative record 595 to 596 about the communications they were receiving from Donohue directly. And then at administrative record 876 to 877 is the that the IHOPE school had sent discussing the trend more broadly and their advice to parents about whether they should consider the advice they were receiving from Mr. Donohue. And of course, as you recognize, the IHO and SRO were both familiar with this through other cases and while that wasn't perhaps sufficient totally for them to rely on, part of the reason why this court has recognized that deference is entitled to the administrative fact finders in this area is the expertise that they get from handling these cases repeatedly. And when they are familiar with a pattern that is happening, I think that it is completely reasonable to defer to their expertise in recognizing the goals of the IDEA and the need to encourage parents to for a given school year, the fact that we want to set up a collaborative system as the IDEA was intended to do in which parents are acting reasonably along with the school districts to reach the best outcomes for all children. Thank you very much. Thank you. Anything else while we hear the two minutes of rebuttal from Mr. Bellantoni, we'll keep you to two minutes. As far as deference goes, this court has held, and there are sites in the brief, deference is not owed to a decision on prog three. Assessing the equities is something the court can do and probably does better than an IHO and SRO in most instances. There's nothing about special education that needs to be considered. As far as, again, even if we're talking about some concerted effort, the tuition, the reimbursement would be reduced, diminished, or found not to be owed to the plaintiffs. Are we talking about a concerted effort? Are we talking about a systematic process by which parents are advised to reschedule, be difficult, be absent in order to create a record that would be unfavorable? No, no, not at all, your honor. And I submit, and if the parents have a statutory right to have a physician present, whatever the reason, much like motive is not something you consider. That I ask you a completely different question. No, there is no concerted effort. I answered the question. There's no concerted effort. These kids, they want to be in each school. Let me ask it a different way. Is there a concerted effort to advise parents to ask for a physician to be present? Not a concerted effort, no. The physician is requested in some cases, in other cases, because these are kids with traumatic brain injury. I understand why. The question is whether there's a concerted effort to advise parents to ask for this. When you say concerted, I would say no. One lawyer who's telling all the parents to do this. No, I mean, it's a difficult question for me to ask because parents routinely ask for a physician to be present, whether they're my clients or others. And I wasn't at this firm in 2018 when this was going on. Let me ask you a different question then, and this is my last question. I remain a little confused about the dueling Rule 56 statements. And your opponent pointed out to me, which I had not quite noticed before, that even though in their response to the plaintiff's Rule 56 statement, they said it was on the very same day they filed their own competing Rule 56 statement that said that the March 20th meeting was canceled by the plaintiffs. That's age 65. And I'm going to ask a very simple question. After the defendants filed their Rule 56 statement on April 13th, 1922, Document 46, did the plaintiffs file a response to that in terms of a response to the local Rule statement? Not a brief, because I see all the briefs and the motions and whatnot. Your Honor, as I stand here, I don't know. But on page 10 of our reply brief, we do cite to SRO Base, where he ultimately says, for the purpose of the appeal, the parties are now in agreement that the meeting did occur. That's in their record. That's his finding in the footnote. Okay. The one last thing I'd like to address, going back to this idea of a concerted effort. Give it 15 seconds. If there was a concerted effort, then the DOE would have to show that they couldn't create an IEP because of that. Here, they created an IEP, which was otherwise inappropriate. It's not like the obstruction, not bringing the child to the DOE, not sending records. They didn't come into the hearing and say, we couldn't create an IEP here because the parents didn't cooperate. No, they created an IEP. It was just inappropriate. So in this case, whatever behavior was going on, it should not lead to a reduction or complete diminution in the relief sought by the parents. Okay. Thank you very much. We will take the case under advisement.